

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 3 0 2018

~~CHIEF JUSTICE~~

This opinion was filed for record

at _8 a.m._ on _August 30, 2018_

Susan L. Carlson

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| PUGET SOUNDKEEPER ALLIANCE, | ) | No. 94293-5 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF ECOLOGY; and | ) | En Banc |
| STATE OF WASHINGTON POLLUTION | ) | |
| CONTROL HEARINGS BOARD, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | Filed **AUG 3 0 2018** |

JOHNSON, J.—In this case, we are asked to decide whether Department of Ecology's current waste discharge permitting process complies with RCW 90.48.520's requirement for "permit conditions [to] require *all known, available, and reasonable* methods to control toxicants in the applicant's wastewater." (Emphasis added.) No disagreement exists that Ecology uses the most sensitive testing method federally approved to monitor permit compliance. The issue in this case is whether RCW 90.48.520 requires Ecology to use a more sensitive testing method not recognized by Ecology or the United States Environmental Protection

Agency (EPA) as reliable for permit compliance purposes. We hold that it does not and affirm the Court of Appeals.[1]

FACTS AND PROCEDURAL BACKGROUND

This case was brought by Puget Soundkeeper Alliance (Soundkeeper), who challenged Ecology's issuance of a discharge permit to Seattle Iron and Metals (SIM). Although Soundkeeper challenged the permit issuance on several theories, the issue before us centers on the testing methodology required as a permit condition to monitor compliance.

Ecology is a state water pollution control agency responsible for administering the National Pollutant Discharge Elimination System (NPDES) permit program in compliance with the Clean Water Act (CWA) (also known as the Federal Water Pollution Control Act), 33 U.S.C. §§ 1251-1388. The permits allow for the discharge of certain pollutants into navigable waters, so long as those discharges are in compliance with the permit terms and consistent with state and federal law.

---

[1] The Court of Appeals affirmed in part and reversed in part the Pollution Control Hearings Board's decisions on two different permit provisions that Puget Soundkeeper Alliance challenged below. The lower court's partial reversal is not before us.

The permit in question[2] was issued in 2013 to SIM, an auto shredding and metal recycling facility, which extracts and sells recoverable metals from auto shredder residue. SIM is located along the Lower Duwamish Waterway (Waterway), the 5.5 mile section of the Duwamish River flowing into Elliott Bay. The EPA has designated the Waterway a cleanup site.

SIM's operations generate wastewater and stormwater, which are prohibited without an NPDES permit. Among other requirements, NPDES permits must impose effluent limitations to ensure against violations of water quality standards. 33 U.S.C. §§ 1311(b)(1)(C), 1342(a)-(b); WAC 173-226-070. Of particular concern is the presence and concentration of polychlorinated biphenyls (PCBs).

Banned since the 1970s, PCBs are manufactured toxic chemicals that persist in the environment and are capable of bioaccumulation and biomagnification: they increase in concentration in individual organisms and with each successive level of the food chain. This means that even though PCBs are no longer manufactured in the United States, they remain present in our air, water, and soil. The SIM permit requires monitoring of discharged treated wastewater and untreated stormwater for PCBs using Method 608 to conduct the monitoring. Soundkeeper sought administrative review of SIM's permit, challenging, among other things, the PCB

---

[2] SIM's current permit is set to expire on October 1, 2018.

limits imposed and the use of Method 608 instead of a different, more sensitive test, Method 1668C.

The Pollution Control Hearings Board (Board) conducted an evidentiary hearing and concluded that to protect human health, the PCB limit in the discharged water is 0.00017 µg/L (micrograms per liter). *See* WAC 173-201A-240(5). The Board also concluded that under existing state and federal regulations, Ecology was required to use Method 608 in NPDES permits and could seek EPA's approval to use Method 1668C, but was not required to do so because Method 608 was the only EPA-approved test available.

Soundkeeper appealed, renewing its objections to the 2013 SIM permit. The Court of Appeals affirmed the Board's determination regarding Ecology's use of Method 608 in the SIM permit and Method 1668C's unavailability.

ANALYSIS

In its argument to us, Soundkeeper essentially contends that compliance with a regulation, WAC 173-201A-260(3)(h),[3] conflicts with a statute, RCW 90.48.520. Specifically, it argues that because the testing procedure required under the

---

[3] The regulation reads, in relevant part, "The analytical testing methods for [the] numeric criteria must be in accordance with the '*Guidelines Establishing Test Procedures for the Analysis of Pollutants*' (*40 C.F.R. Part 136*) or superseding methods published. The department may also approve other methods following consultation with adjacent states and with the approval of the [EPA]."

regulation cannot detect water quality violations that the statute prohibits, the permit conditions violate state law. Soundkeeper contends that Ecology could have selected the more sensitive Method 1668C because it is a "superseding method" under WAC 173-201A-260(3)(h).

A.     Standards of Review

This court reviews orders from the Board under the Washington Administrative Procedure Act, chapter 34.05 RCW. RCW 90.48.230; RCW 34.05.518; *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 789-90, 51 P.3d 744 (2002). Judicial review is limited to the record before the board, RCW 34.05.558, and the burden of demonstrating the invalidity of an agency action rests with the party asserting invalidity. RCW 34.05.570(1)(a).

Under the Washington Administrative Procedure Act, we may grant relief if we find the order from the Board is unconstitutional, exceeds its statutory authority or jurisdiction, is inconsistent with an agency's rule, is arbitrary and capricious, or the agency erroneously interpreted or applied the law. RCW 34.05.570(3).

We review an agency's legal determinations under the "error of law" standard and may substitute our interpretation of the law for that of the agency's. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000) (citing RCW 34.05.570(3)(d)). Under this standard, we review questions of law, including statutory construction, and an agency's application of the law de novo.

*Snohomish County v. Pollution Control Hr'gs Bd.*, 187 Wn.2d 346, 357, 386 P.3d 1064 (2016); *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). "[W]e accord an agency's interpretation of the law great weight where the statute is ambiguous and is within the agency's special expertise." *Snohomish County*, 187 Wn.2d at 357.

B.    Statutory and Regulatory Requirements for Water Pollution

State and federal law govern water pollution control. In 1972, Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that purpose, the CWA prohibits the discharge of pollutants from a point source absent an NPDES permit. 33 U.S.C. §§ 1251(a), 1311(a), 1342(a). Congress "authorized the [EPA] to delegate the NPDES permitting program to the states. [33 U.S.C.] § 1342(b)." *Snohomish County*, 187 Wn.2d at 352. The EPA delegated this authority to Ecology in Washington. RCW 90.48.260(1). "The legislature has recognized that Ecology has '[c]omplete authority to establish and administer' the program." *Snohomish County*, 187 Wn.2d at 352 (alteration in original) (quoting RCW 90.48.260(1)(a)).

An entity such as SIM may obtain an NPDES permit that allows some pollutant discharge, 33 U.S.C. §§ 1311(a), 1342(a)(1), and must comply with the

applicable state water quality standards, which may be more stringent than required by federal law. 33 U.S.C. § 1370; 40 C.F.R. § 122.4(d).

Washington's water quality standards include both narrative and numeric criteria for toxicants. WAC 173-201A-010(1). The administrative code identifies the numeric water quality standards for toxic substances and limits the concentration of PCBs to 0.00017 µg/L. WAC 173-201A-240(5) tbl. 240.

C.    Method 608 satisfies state and federal statutory and regulatory requirements as the only known, available, and reasonable method for compliance monitoring

Soundkeeper contends that requiring use of Method 608 to monitor PCB levels in accordance with state regulations violates the state statute because the test cannot ensure a permit holder complies with statutory water quality standards. However, Soundkeeper mistakes monitoring for ensuring compliance.

As mentioned earlier, an NPDES permit specifies water quality criteria and the required methods to apply it. WAC 173-201A-260(3). Method 608 has a practical quantitation limit of 0.5 µg/L, which means that it can reliably quantify PCB concentrations only at that level.[4] WAC 173-201A-240(5) tbl. 240; Admin. Record (AR) at 3305. Using Method 608 does not test for effluent concentrations

---

[4] In the record, Method 608 is referenced as having a practical quantitation limit of 0.5 µg/L and a method detection limit of 0.25 µg/L. The former represents "the lowest level at which a concentration can be detected where the accuracy (precision and bias) of the detection achieves the objectives of the intended purpose." Clerk's Papers at 39.

to the 0.00017 µg/L level, nor does it reliably quantify anywhere between that level and the 0.5 µg/L level. Soundkeeper's position is that this, in turn, violates RCW 90.48.520.

The question here is whether the permitting scheme violates the statutory mandate and the corresponding federal duty to refrain from issuing discharge permits "[w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States." 40 C.F.R. § 122.4(d). Soundkeeper bears the burden of proving an agency action conflicts with state or federal laws.

The Board upheld Ecology's use of Method 608 as the only method currently approved by the EPA for compliance monitoring in NPDES permits and suggested that Ecology may petition the EPA for approval of an alternative test procedure. It rejected Soundkeeper's contention that Ecology's failure to seek EPA approval of Method 1668 violated our water pollution control act (WPCA), chapter 90.48 RCW. It noted that "[t]he policy declarations in the WPCA do not 'control over the more specific statutory provisions adopted to implement those general declarations' and those declarations 'have no operative force in and of themselves.'" Clerk's Papers (CP) at 48 (quoting *Puget Soundkeeper All. v. State*, 102 Wn. App. 783, 790, 9 P.3d 892 (2000)). The Board concluded that the permit

was consistent with the requirement of the state "Surface Water Quality Standards."

Division Two affirmed the Board's conclusion in an unpublished opinion. It found Soundkeeper's argument to be inconsistent with federal and state laws regarding testing methods. In reconciling state and federal statutes and regulations, it noted that the EPA has not yet approved Method 1668C, that 40 C.F.R. § 122.44(i)(1)(iv) calls for monitoring to be done using only "*sufficiently* sensitive"[5] test methods, and that Ecology's interpretation of WAC 173-201A-260(3)(h) correctly determined Method 1668C not to be available, necessarily making Method 608 sufficiently sensitive. We agree.

The federal aspect of that legal question is answered by 40 C.F.R. § 122.44(i). The EPA has anticipated that there may be instances—like the one at issue here—where its approved testing methods are not sensitive enough to detect the state or federal effluent limits. Federal regulation states that the testing method used for monitoring effluent limits need only be "sufficiently sensitive." 40 C.F.R. § 122.44(i)(1)(iv). It further specifies that a testing method is considered "sufficiently sensitive" if it "has the lowest [minimum level] of the analytical

---

[5] *Puget Soundkeeper All. v. State*, No. 48267-3-II, slip op. at 11 (Wash. Ct. App. Feb. 22, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2048267-3-II%20Unpublished%20Opinion.pdf (emphasis added).

methods approved under 40 [C.F.R.] part 136 or required under 40 [C.F.R.] chapter I, subchapter N or O for the measured pollutant or pollutant parameter." 40 C.F.R. § 122.44(i)(1)(iv)(A)(2). Soundkeeper agrees that Ecology is using the only testing method approved by the EPA for monitoring PCBs under the circumstances of this case. Puget Soundkeeper All.'s Suppl. Br. at 12. No conflict therefore exists with the federal regulation.

The state monitoring scheme is read in conjunction with the statutory mandate. RCW 90.48.520, the statute in question, in relevant part, reads as follows:

> In order to improve water quality by controlling toxicants in wastewater, the department of ecology shall in issuing and renewing state and federal wastewater discharge permits review the applicant's operations and incorporate permit conditions which require *all known, available,* and *reasonable* methods to control toxicants in the applicant's wastewater. Such conditions may include, but are not limited to: (1) Limits on the discharge of specific chemicals, and (2) limits on the overall toxicity of the effluent. . . . *In no event shall the discharge of toxicants be allowed* that would violate any water quality standard, including toxicant standards, sediment criteria, and dilution zone criteria.

(Emphasis added.)

From the outset we note that the blanket prohibition on "the discharge of toxicants . . . that would violate any water quality standard" in RCW 90.48.520 does not mean that this court, and not the agency charged with enforcement and employing its expertise, will command a specific way of ensuring compliance by a

10

permittee. As Ecology and various amici point out, monitoring is just one of the ways in which discharge permits ensure compliance with RCW 90.48.520 and other applicable state and federal laws.[6] Requiring the permittee to implement specific water treatment practices that are designed to reach the required PCB cap is, as logic would dictate, a more effective method of preventing unlawful discharges *before* they can occur than simply to monitor a release of harmful chemicals that has already occurred. Thus, while 40 C.F.R. § 122.44(i) requires monitoring of effluent from each outfall to assure compliant performance, the selection of the monitoring method is not at the center of compliance.

More importantly, the statute's plain language does not require a perfectly sensitive test. It requires that the test, in addition to being known and available, also be reasonable. Methods 608 and 1668C are both "known" and both appear to be available.[7] The question we have to answer here is whether Ecology's decision to use Method 608 in the 2013 SIM permit was also "reasonable." We conclude that it was.

---

[6] *See, e.g.*, 40 C.F.R. § 122.41(e) ("The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee *to achieve compliance* with the conditions of this permit." (emphasis added)).

[7] While Method 1668C has not been approved by 40 C.F.R. § 136, WAC 173-201A-260(3)(h) allows Ecology to "also approve other methods following consultation with adjacent states and with the approval of the [EPA]."

We first note that when the EPA considered approving Method 1668C for compliance monitoring, it deferred action after receiving mixed comments from public agencies and industry stakeholders about feasibility and cost. Guidelines Establishing Test Procedures for the Analysis of Pollutants Under the Clean Water Act; Analysis and Sampling Procedures, 77 Fed. Reg. 29,758, 29,763 (May 18, 2012). It has withheld approval as recently as 2017. Clean Water Act Methods Update Rule for the Analysis of Effluent, 82 Fed. Reg. 40,836, 40,876 (Aug. 28, 2017). It was not unreasonable for Ecology in these circumstances to select Method 608 as the only federally approved test method for testing the federally established human health limit that Washington was using in 2013.[8] As Ecology has made clear to this court, the use of Method 1668C would strip it of its power and ability to enforce the law. Wash. Supreme Court oral argument, *Puget Soundkeeper All. v. Dep't of Ecology*, No. 94293-5 (Oct. 19, 2017), at 21 min., 31 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. As Ecology points out, Method 1668C is unreliable because that test does not allow Ecology to determine whether any of the PCBs detected

---

[8] We note here that Ecology is wise to keep exploring the best testing available and might even have a duty to implement the most technologically superior monitoring methods. Based in its widespread adoption in the watershed and other facts in the record, CP (Finding of Fact 51) at 40, the Board encouraged Ecology to seek EPA approval to use Method 8082A for monitoring of permit compliance at SIM. CP (Conclusion of Law 29) at 61. Whether Ecology has a duty to do so, we need not consider because the issue is not currently before us.

come from the discharger, the test container itself, or the ambient air. This means that the test would detect the presence of PCBs but would not identify the source. Any polluter subject to an enforcement action stemming from Ecology's use of such method of detection would predictably be able to challenge the validity the agency's actions because of the inability to identify the source of the pollution. Method 608, in contrast, can accurately identify the source.[9]

Ecology's decision to use Method 608 in this context is not only reasonable but perhaps the most sensible and viable decision. Ecology sets maximum effluent limits for certain pollutants at numbers presently undetectable and unquantifiable in order to encourage scientific progress toward the goal of cleaner and safer water.[10] Given these considerations, Soundkeeper has not established that Method 1668C is a "reasonable" method for Ecology to use or that Ecology's use of Method 608 is "unreasonable." Soundkeeper's argument might result in Ecology losing the ability to enforce and monitor discharge of pollutants into our streams and waters.

---

[9] Ecology has previously issued SIM notices of violation for exceeding its 2007 permit effluent limits resulting in SIM making improvements to its discharge treatment system. CP at 20.

[10] Wash. Supreme Court oral argument, *supra*, at 16 min., 46 sec. through 17 min., 10 sec. (explaining how "it is common to have the limit driving the technology. In other words, we have a number of toxic chemicals . . . where the limit is lower than what the current tests are able to reach. But, setting that human health limit where we know it needs to be still has value because it allows laboratories to strive towards that goal").

The Board held that Method 1668C was not available to use in SIM's permit because WAC 173-201A-260(3)(h) requires federal approval of effluent testing methods. CP at 47. Method 608 is EPA approved, and Ecology was required to use that test. Soundkeeper contends that Ecology could have selected the more sensitive but less reliable Method 1668C because it is a "superseding method" under WAC 173-201A-260(3)(h). We disagree.

Ecology applies state water quality criteria according to WAC 173-201A-260(3). This regulation provides that Ecology may select a testing method that (1) is listed in 40 C.F.R. § 136, (2) qualifies as a published "superseding method[]," or (3) is sought by Ecology and approved by EPA. Soundkeeper agrees that Method 1668C does not meet option (1) or (3).

EPA approves testing methods through a process of formal notice and comment rulemaking. 33 U.S.C. §§ 1311(a), 1314(h), 1361(a). Section 1314(h) requires the EPA to "promulgate guidelines establishing test procedures for the analysis of pollutants." Currently, federal regulation recognizes only Method 608. 40 C.F.R. § 136.3 tbl. IC; 82 Fed. Reg. at 40,836-40,941 (Aug. 28, 2017) ("[A]t the time of writing of this revision, Method[] 1668C . . . had not been approved for use at 40 [C.F.R] part 136."). Moreover, Soundkeeper has not alleged and the record does not reflect that Soundkeeper or any other entity has sought Ecology's

14

approval for Method 1668C, following consultation with adjacent states and EPA approval.

Thus, for Method 1668C to qualify under WAC 173-201A-260(3)(h) it must be a "superseding method[] published." The parties do not disagree that Method 1668C is a "published" method by EPA. Instead, Ecology disputes whether the method is "superseding," Resp't's Suppl. Br. at 12-14, which requires us to interpret WAC 173-201A-260(3)(h).

When interpreting agency regulations, we apply the same principles used to construe statutes. *Lopez Demetrio v. Sakuma Bros. Farms*, 183 Wn.2d 649, 655, 355 P.3d 258 (2015); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). When we interpret a statute, we look first to the plain language. *Campbell & Gwinn*, 146 Wn.2d at 11. We derive the plain meaning "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn*, 146 Wn.2d at 11. Language is unambiguous if it has only one reasonable interpretation. *Campbell & Gwinn*, 146 Wn.2d at 12.

State regulations do not define the term "superseding," so we determine the meaning of this term by looking at its ordinary definition. *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009) (citing *Garrison v. Wash. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976)). *Webster's*

15

explains that "supersede" means (a) "to make obsolete, inferior, or outmoded," (b) "to make void," or (c) "to make superfluous or unnecessary." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2295 (2002). *Webster's* further defines "supersede" as "to cause to be supplanted in a position or function." WEBSTER'S at 2295. Similarly, *Black's* defines "supersede" as "[t]o annul, make void, or repeal by taking the place of <the 1996 statute supersedes the 1989 act>." BLACK'S LAW DICTIONARY 1667 (10th ed. 2014).

These definitions demonstrate that "supersede" means to take the place of something, to supplant it. Here, Method 1668C has not taken the place of Method 608. The EPA developed Method 1668C intending it to be used in Clean Water Act programs. AR at 2751. Importantly, the EPA has stated that it expects the method to be "add[ed]" to other CWA testing processes published at 40 C.F.R. § 136. AR at 2751. The EPA developed and published Method 1668C for use *in addition* to other tests. A supplemental testing method does not supplant, void, or make obsolete a previously adopted testing procedure. Therefore, Method 1668C does not constitute a "superseding method" under WAC 173-201A-260(3)(h) and we affirm the Court of Appeals and the Board's ruling.

CONCLUSION

Ecology's use of Method 608 in the SIM permit is consistent with the plain meaning of the statutory language in question, RCW 90.48.520. Nothing in the language of the statute requires Ecology to use unreliable and unapproved testing methods to ensure compliance with the law. Neither federal nor state law require that the monitoring method reach the PCB limit of 0.00017 µg/L. WAC 173-201A-260(3)(h) does not conflict with RCW 90.48.520. Ecology followed WAC 173-201A-260(3)(h)'s directive that "analytical testing methods for these numeric criteria must be in accordance with . . . (*40 C.F.R. Part 136*) or superseding methods published," and that "[t]he department may also approve other methods following consultation with adjacent states and with the approval of the [EPA]." Method 608 is the only reliable test currently available, and Ecology, in applying its expertise, determined that it should be used as one of several ways the agency ensures compliance with permit limitations. The record before the Board supports this decision.

Use of an unapproved and unreliable test, such as Method 1668C, would not provide a basis for enforcement of the PCB permit limits. Both Ecology and the

Board agree on this issue, and we have established that "we are loath to override the judgment of both agencies, whose combined expertise merits substantial deference." *Port of Seattle*, 151 Wn.2d at 600. We affirm.

WE CONCUR:

No. 94293-5

GONZÁLEZ, J. (dissenting) —In Washington, there is no right to discharge pollutants. Accordingly, an entity is not permitted to discharge unless it can prove that there will be no resulting pollution of our waterways. RCW 90.48.520; WAC 173-201A-240(1) (toxic substances "shall not be introduced above natural background levels in waters of the state which have the potential . . . to adversely affect" water use, toxicity, or public health), -510(1) ("The primary means to be used for controlling . . . waste discharges shall be through the issuance of waste discharge permits . . . [which] must be conditioned so the discharges authorized will meet the water quality standards."). Here, the majority is turning the protective nature of Washington's water quality standards on its head by reducing entities' responsibility to establish they will not pollute through their discharge. As a result, I respectfully dissent.

Washington law highly regulates the discharge of pollutants into the waters of our state. Ch. 90.48 RCW. It is "unlawful for any person to . . . discharge into any of the waters of this state . . . matter that shall cause or tend to cause pollution

of such waters." RCW 90.48.080. As a concession, perhaps, to the perceived necessities of the time, pollution may be permitted, subject to stringent controls, under discharge permits issued by the Department of Ecology. RCW 90.48.520. Even when done under a permit, however, "[i]n no event shall the discharge of toxicants be allowed that would violate any water quality standard, including toxicant standards, sediment criteria, and dilution zone criteria." *Id.* And "[w]hile an end to the discharge of pollutants has not been achieved, it remains the legally cognizable end point of water pollution regulation" and informs the interpretation in both federal and state cases. 23 TIMOTHY BUTLER & MATTHEW KING, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 7.21, at 165 (2d ed. 2007).

Seattle Iron and Metal (SIM) operates an auto shredding and metal recycling business that discharges polluted wastewater and storm water into the Lower Duwamish Waterway (Waterway), the 5.5 mile section of the Duwamish River flowing into Elliott Bay.

For many years, the Waterway has been utilized as a resource. Native American peoples, such as the Squaxin Island Tribe, have caught and consumed fish and shellfish from its waters. Amicus Curiae Squaxin Island Tribe Br. at 1. Seattle industries have used the Waterway since the 1900s, resulting in heavy pollution of the area. Pollution Control Hr'gs Bd. Findings of Fact, Conclusions of

Law & Order (PCHB Order) at 3. As a result, the sediment and tissues of resident sea life now exhibit elevated levels of substances hazardous to human health. Of particular concern are polychlorinated biphenyls (PCBs). Banned since the 1970s, PCBs are manufactured chemicals once widely used in products like electric transformers, paint additives, and fire retardants. These chemicals are highly toxic, persist in the environment for decades, and possess bioaccumulative properties.

The heightened level of PCBs in the Waterway's organic and inorganic material has attracted the attention of multiple state and federal agencies. The Washington Department of Health cautions against human consumption of seafood caught on the Waterway, classifying it as a "public health hazard." *Id.* at 4 (emphasis omitted). The United States Environmental Protection Agency (EPA) has designated the Waterway a cleanup site with federal and state governments cooperating to remediate and prevent further contamination.

In September 2013, Ecology issued a waste discharge permit to SIM. The permit allowed wastewater discharges from the facility and required use of Method 608 to measure toxicants in its wastewater and storm water discharges. The permit further required SIM to collect and submit discharge samples to a registered laboratory for testing and to report this monitoring data to Ecology. Any water quality violations were to be immediately reported. Between December 2007 and June 2008, SIM failed to meet permit effluent limitations and conducted an

unauthorized discharge. In response, Ecology issued a violation and noncompliance notice.[1]

The permit established toxicant limitations and required testing methods to monitor these toxicants. Puget Soundkeeper Alliance (Soundkeeper) challenged the permit before the Pollution Control Hearings Board (Board), which largely upheld it. Soundkeeper asks this court to reverse the Board's ruling and hold that state regulations allow use of a more sensitive testing method than required by SIM's permit or, alternatively, that the permit was contrary to state law because it could not ensure compliance with water quality standards.

At the outset, I agree with the majority that Method 1668C does not constitute a "superseding method[]" under WAC 173-201A-260(3)(h). Majority at 16-17. Under WAC 173-201A-260(3), Ecology must use EPA-approved testing methods, and Method 1668C is not an approved method.[2]

I diverge from the majority because requiring use of Method 608 to monitor PCB levels fails to ensure a permit holder's compliance with statutory water quality standards. Accordingly, a permit that relies on Method 608 violates state law. Such a permit should be denied. I cannot join the majority's conclusion that

---

[1] Ecology previously issued a discharge permit to SIM in 2007. Neither the 2007 permit nor earlier violations are at issue here.

[2] Clean Water Act Methods Update Rule for the Analysis of Effluent, 82 Fed. Reg. 40,836, 40,876 (Aug. 28, 2017) (explaining that while Method 1668C "may be useful for determination of PCBs as individual chlorinated biphenyl congeners.... [it] ha[s] not been approved for use at 40 CFR part 136").

we should set aside state law standards in favor of less protective federal water quality standards. This deference is to the detriment of our state law and our State's environment. Accordingly, I respectfully dissent.

The National Pollutant Discharge Elimination System (NPDES) permits must ensure compliance with *both* state and federal water quality standards. 33 U.S.C. § 1311(b)(1)(C); *Snohomish County v. Pollution Control Hr'gs Bd.*, 187 Wn.2d 346, 352, 386 P.3d 1064 (2016). NPDES permits specify water quality criteria and the required testing methods to apply. WAC 173-201A-260(3). State law dictates that Ecology shall "incorporate permit conditions which require all known, available, and reasonable methods to control toxicants in the applicant's wastewater." RCW 90.48.520. It also forbids release of toxicants that would violate any water quality standard, including toxicant standards. RCW 90.48.520 ("In no event shall the discharge of toxicants be allowed that would violate any water quality standard[]."). Thus, Ecology must modify an NPDES permit "when it is determined that the discharge causes or contributes to a violation of water quality standards" in our state. WAC 173-201A-510(1)(b).

Federal regulations recognize that states may implement more stringent water quality standards than provided in federal law. 40 C.F.R. § 122.44(d). Our legislature has expressly stated that it is "the public policy of the state of Washington to maintain the highest possible standards to insure the purity of all

5

waters of the state consistent with public health and public enjoyment thereof," and "require the use of all known available and reasonable methods by industries . . . to prevent and control the pollution" of waters. RCW 90.48.010.

Washington regulation explains that a testing method must meet one of three requirements for use in NPDES permits: be in accord with 40 C.F.R. § 136, qualify as a superseding published method, or use another Ecology-selected method subject to EPA approval. WAC 173-201A-260(3)(h). A testing method approved under 40 C.F.R. § 136 is acceptable for a state-issued permit, but it is not required. More importantly, where state law precludes pollution and 40 C.F.R § 136-testing methods cannot ensure compliance with that law, WAC 173-201-260(3)(h) provides a solution: seeking EPA approval for a different testing method. While it is certainly relevant to this case that 40 C.F.R. § 122.44(i) sets out sufficiently sensitive testing requirements under federal law, this regulation by no means answers the question currently before us: whether *Washington law* permits a testing method that cannot ensure compliance with applicable toxicant standards.

An enforcement regime that fails to enforce the law renders RCW 90.48.520 meaningless. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (statutes must be interpreted so that all language is given effect and no portion rendered meaningless). For example, the heavy contamination of the Waterway, coupled with the tenacious bioaccumulative properties of PCBs, illustrates the significant

6

hazard this pollution poses to aquatic life and to the health of Washington citizens, especially Native American peoples, who consume and commercially harvest Waterway fish and shellfish. To combat and protect against these risks, we must zealously guard our natural resources. Granting an effluent permit that fails to ensure compliance with our strict water quality standards does little to protect these resources and will ultimately contribute to the continued contamination of the Waterway. Entities have no right to pollute state waters.

At issue here is Method 608 and the human health criteria of 0.00017 µg/L (micrograms per liter), the applicable water quality and toxicant standard. Method 608 has a practical quantitation limit of 0.5 µg/L, meaning it can reliably quantify PCBs only at that level. WAC 173-201A-240(5) tbl. 240. Any test result showing toxic substances between 0.00017 and 0.5 µg/L would not reveal effluent limit violations. Because Method 608 cannot quantify these violations, it cannot ensure permit holders comply with state water quality standards under RCW 90.48.520. *See also* 40 C.F.R. § 122.4(d). This results in de jure prohibition and de facto permission to pollute with PCBs. Permits incapable of quantifying toxicant standard violations necessarily allow polluters to go unregulated. Ultimately, to agree with the majority opinion is to accept that toxicant violations can, do, and will continue to occur at a rate greater than 2,900 times the legal limit—more than

7

2,900 times above the level protective of human health. But the majority does not reconcile this fact or acknowledge that this is the reality.

NPDES permit testing procedures detect toxicants at different concentrations. "All testing methods have a method detection level," which is the "lowest level at which the concentration of a substance can reliably be detected." PCHB Order at 26. Using this method detection level, the practical quantitation level is calculated; this represents the lowest level at which a concentration can be reliably quantified.

The majority cites 40 C.F.R. § 122.44(i)(1)(iv)(A)(2) as validating the use of Method 608 in SIM's permit. Majority at 9-10. This regulation provides that a toxicant monitoring method is sufficiently sensitive if the method minimum level is at or below the limit specified in the permit or it is adopted in 40 C.F.R. § 136. Notably, this regulation does not specify the level required by individual states. Indeed, federal regulations leave it to individual states to determine the acceptable testing methods and water quality standards for permit holders.

In light of the applicable toxicant standard set for SIM, to satisfy the law, SIM's permit must contain a testing method that has the capacity to quantify toxicants at the level of 0.00017 µg/L. Ecology argues that under WAC 173-201A-260(3)(h), it could select only a method approved by 40 C.F.R. § 136. But Ecology's discretion is not so limited. WAC 173-201A-260(3)(h) allows the

8

agency to "also approve other methods following consultation with adjacent states and with the approval of the [EPA]." Ecology may therefore seek approval of other methods, such as Method 1668C or Method 8082A, for use in NPDES permits.[3] Indeed, Ecology has previously acquired EPA approval for alternative tests in some cases. At a Boeing cleanup site, for example, Ecology staff approached their federal counterparts to obtain permission to use a more sensitive testing method than approved by 40 C.F.R. § 136. Boeing and Ecology jointly wrote to the EPA, requested use of the alternate method, and within approximately 45 days, EPA granted approval. Verbatim Report of Proceedings (Mar. 19, 2015) at 711-14.

I am not advocating for a categorical proclamation against issuing NPDES permits. We recognize that the process of establishing a permittee's permissible effluent discharge limit and water quality standard is highly fact specific. Where a permit holder's effluent discharges can be reliably measured, by Method 608 for example, and those measurements ensure compliance with applicable water quality standards, such a permit would likely comply with both state and federal law and

---

[3] At the Board's hearing in this matter, an Ecology representative acknowledged that Method 8082A was originally required in SIM's 2013 permit because the agency felt it needed to detect PCBs at lower levels than Method 608 allowed. PCHB Order at 27. Prior to the hearing, Ecology determined Method 8082A was ineligible for use in discharge permits because it was not included in 40 C.F.R. § 136, and Ecology modified SIM's permit to require Method 608 instead. Ecology's representative testified that requesting blanket approval from the EPA to use Method 8082A for Duwamish sites would "be a good proposal because the method is already being used by several government agencies, including Ecology." *Id.*

regulation. In instances where a testing method cannot ensure compliance with state water quality standards, Ecology is not required to deny a permit—it may review the applicable toxicant standard or seek EPA approval for alternative testing methods, as it has done in the past.

The Board's ruling that Ecology may issue a waste discharge permit that complies with state regulation but cannot accurately quantify water quality violations was contrary to state law, RCW 90.48.520, and federal regulation, 40 C.F.R. § 122.44(d)(1). To find otherwise, as the majority does, jeopardizes the well-being of our environment. In the future, if using a method that does not comport with state statutory standards, Ecology must make recorded attempts to get EPA approval of a sufficient alternative testing method per WAC 173-201-260(3)(h). NPDES permits should be denied if the required method cannot ensure compliance with our state law. Accordingly, I respectfully dissent.

González, J.