# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| NORTHWEST PULP & PAPER ASSOCIATION; THE ASSOCIATION OF WASHINGTON BUSINESS; AND WASHINGTON FARM BUREAU, | No. 55164-1-II |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | PUBLISHED OPINION |
| Respondent. | |

GLASGOW, A.C.J.—In July 2018, the Department of Ecology added a new section, chapter 6, section 4.5 (Section 4.5), to its Water Quality Program Permit Writer's Manual to specifically address the release of polychlorinated biphenyls (PCBs) into Washington's surface waters. To identify and measure the presence of PCBs in surface waters, Section 4.5 allows the use of testing Methods 1668C and 8082A, which are particularly sensitive, in addition to Method 608.3, the method expressly authorized in federal regulation.

Northwest Pulp & Paper Association, Association of Washington Business, and Washington Farm Bureau (hereinafter collectively referred to as Northwest Pulp & Paper) petitioned for judicial review and declaratory judgment under the Washington Administrative Procedure Act (APA), chapter 34.05 RCW, asking the superior court to invalidate Section 4.5. Northwest Pulp & Paper argued Section 4.5 is an invalid rule under the APA because Ecology

failed to comply with the procedural requirements for rule making, Ecology exceeded its authority, and the section is arbitrary and capricious. The superior court dismissed the petition and denied the request for declaratory judgment, concluding that Section 4.5 is not a rule under the APA.

We hold Section 4.5 is guidance for agency staff, not a rule subject to the APA's rule-making requirements. We affirm.

## BACKGROUND

### I. PCBs, Pollutant Discharge Permits, and State Water Quality

"Banned since the 1970s, PCBs are manufactured toxic chemicals that persist in the environment and are capable of bioaccumulation and biomagnification: they increase in concentration in individual organisms and with each successive level of the food chain." *Puget Soundkeeper All. v. Dep't of Ecology*, 191 Wn.2d 631, 635, 424 P.3d 1173 (2018) (*Seattle Iron & Metals*). Some PCBs are likely carcinogens that are harmful to humans.

The federal Clean Water Act (also known as the Federal Water Pollution Control Act), 33 U.S.C. §§ 1251-1388, seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by regulating the discharge of pollutants, including PCBs. 33 U.S.C. § 1251(a); 40 C.F.R. § 129.4(f). Under the Clean Water Act, it is unlawful to discharge any pollutant into the water unless the discharger has applied for and received a National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. §§ 1311(a), 1342(a)(1). In Washington, responsibility for controlling state water pollution and administering the NPDES permit program is delegated to Ecology. 33 U.S.C. § 1342(b); RCW 90.48.260(1).

Ecology has established state water quality standards to protect surface waters in Washington. *See* chapter 173-201A WAC. Water quality standards set contaminant concentration

limits in surface water, ground water, and sediment, for example. These standards include both narrative and numeric criteria. WAC 173-201A-010(1)(a). Washington's narrative standard for toxic substances provides, "Toxic substances shall not be introduced above natural background levels in waters of the state which have the potential either singularly or cumulatively to adversely affect characteristic water uses, cause acute or chronic toxicity to the most sensitive biota dependent upon those waters, or adversely affect public health." WAC 173-201A-240(1).

Initially, Washington's numeric standards for toxic substances included acute and chronic criteria for freshwater and marine water to protect aquatic life. Ecology has since promulgated a rule that added numeric criteria to protect human health. One numeric criterion for protecting human health currently provides that the total PCBs in a body of surface water should be limited to 0.00017 μg/L (micrograms per liter). WAC 173-201A-240(5) tbl.240.

## II. MANAGING PCB POLLUTION

### A.     Effluent Limits and Best Management Practices

If a discharger violates or has the "reasonable potential" to violate water quality standards by discharging a particular pollutant, then the discharger's NPDES permit must contain effluent limitations for that pollutant. 40 C.F.R. § 122.44(d)(1)(iii). An "effluent limitation" is "any restriction . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into surface waters of the state." WAC 173-220-030(9). Effluent limitations may be technology based, meaning they are "based on the capability of a treatment method to reduce the pollutant to a certain concentration." Administrative Record (AR) at 0164.0029. They may also be water quality based, meaning they are based on

3

limiting the concentration of effluent "such that it will not cause a violation of water quality standards." AR at 0164.0030.

The legislature has required, "In no event shall the discharge of toxicants be allowed that would violate any water quality standard." RCW 90.48.520. NPDES permits "must be conditioned so the discharges authorized will meet the water quality standards. No waste discharge permit can be issued that causes or contributes to a violation of water quality criteria." WAC 173-201A-510(1). The policy goal of prohibiting any and all violations of state water quality standards remains difficult to attain in practice, however. "Ecology sets maximum effluent limits for certain pollutants at numbers presently undetectable and unquantifiable in order to encourage scientific progress toward the goal of cleaner and safer water." *Seattle Iron & Metals*, 191 Wn.2d at 643.

In addition to effluent limitations, a permit may require the discharger to use best management practices to prevent the discharge of pollutants. Best management practices may include specific treatment requirements, maintenance and operating procedures, or strategies to control runoff, leaks, and spillage. 40 C.F.R. § 122.2. Permits may require dischargers to comply with narrative conditions that "complement numeric limits," such as requirements to "study the efficiency of the treatment system" or to "develop a plan to identify and implement pollution prevention that is technically and economically achievable." *Puget Soundkeepers All. v. Dep't of Ecology*, 102 Wn. App. 783, 794-95, 9 P.3d 892 (2000).

Ecology's Water Quality Program recommended a new permitting approach for PCBs in 2016 that "requires dischargers to use improved detection methods to find PCBs in waste streams" and to use updated best management practices, based on guidance from the Environmental Protection Agency (EPA) and "on-the-ground experience," to prevent PCB pollution. AR at

0843.0001. The recommended changes were to the methods for detecting PCBs, not PCB effluent limits. However, the program recognized that these changes will "have eventual ramifications to all water quality permittees with PCB limits" because more sensitive methods of monitoring will "turn up previously unseen PCBs in discharges," which "could drive new permit limits and violations." AR at 0843.0001, .0003.

B.        Test Methods for Detecting PCBs

Congress tasked the EPA with "promulgat[ing] guidelines establishing test procedures for the analysis of pollutants." 33 U.S.C. § 1314(h); 40 C.F.R. § 122.2. Those test methods are established in 40 C.F.R. part 136. Currently, the only test method for measuring PCBs that is approved under part 136 is Method 608.3. 40 C.F.R. § 136.3, tbl.IC.[1] The description of Method 608.3 in appendix A of part 136 explains that the "EPA has promulgated this method . . . for use in wastewater compliance monitoring under the [NPDES]" permitting system. 40 C.F.R. Pt. 136, App. A, Method 608.3, at 1.6.1.

Yet, as Ecology explains in its Permit Writer's Manual, surface water quality standards to protect aquatic life and human health are set at levels lower than Method 608.3 is able to detect and quantify. Method 608.3 is able to reliably detect a concentration of 0.065 micrograms of PCBs per liter of water. This means water could contain approximately 382 times more PCBs than the state numeric criterion necessary to protect human health of 0.00017 μg/L, yet the PCBs would

---

[1] Table IC references both Method 608.3 and Method 625.1. Method 608.3 is specifically "for determination of organochlorine pesticides and [PCBs] in industrial discharges and other environmental samples," whereas Method 625.1 is more generally "for determination of semivolatile organic pollutants in industrial discharges and other environmental samples." 40 C.F.R. Pt. 136, App. A, Method 608.3, at 1.1, Method 625.1, at 1.1. The description of Method 625.1 clarifies that "Method 608.3 should be used for determination of pesticides and PCBs." 40 C.F.R. Pt. 136, App. A, Method 625.1, at 1.4.

not be detectable using Method 608.3. *Cf. Seattle Iron & Metals*, 191 Wn.2d at 638 (addressing an argument that monitoring using Method 608 (a precursor to Method 608.3) was insufficient because "the test cannot ensure a permit holder complies with statutory water quality standards").

Two testing methods exist for measuring PCBs that are more sensitive. Methods 8082A and 1668C "provide lower analytical limits" than Method 608.3. AR at 0164.0250. Although Method 608.3 is the only method that can be used under 40 C.F.R. part 136 to determine compliance with numeric effluent limits, Methods 8082A and 1668C may be used for purposes other than determining compliance.

For example, Method 1668C can be used for "monitoring of final effluents for PCB congeners." AR at 0277.0028; *see also* 40 C.F.R. Pt. 136, App. A, Method 608.3, at 1.5 ("Method 1668C . . . may be useful for determination of PCBs as individual chlorinated biphenyl congeners," although Method 1668C has "not been approved for use at 40 [C.F.R.] part 136."). PCBs consist of "209 individual compounds known as congeners." AR at 0922.0004. Mixtures of these compounds were commercially produced, and the mixtures are known by their trade names, most commonly Aroclor. Water quality based effluent limits consider the concentration of total PCBs in the water, and Method 608.3, the part 136-approved method for analyzing PCBs, measures the total concentration of Aroclors in the water. In contrast, Method 1668C is a "very sensitive analytical method that has the capability of detecting 209 different PCB congeners." AR at 0164.0254. The EPA has explained that because there is no part 136-approved method for measuring individual congeners, Ecology has "flexibility to require the use of EPA Method 1668C for monitoring of PCB congeners." AR at 0277.0028.

### III. Section 4.5 of the Permit Writer's Manual

In 2018, Ecology issued a revised version of its Permit Writer's Manual. A cover letter from the Water Quality Program Manager states that this Manual "describes Ecology's procedures when issuing permits for wastewater discharges. Permit writers are required to use the procedures in this manual for developing permits." AR at 0164.0004. However, "[i]f a permit writer believes a permitting situation requires a different process than in the manual, the permit writer should discuss the alternative process with their supervisor." AR at 0164.0004.

The Manual's "Note to Readers" describes it as "a working document for people at [Ecology] who write wastewater discharge permits," and the Manual's introduction similarly classifies it as "a technical guidance and policy manual for permit writers" that aims "to enhance the quality and consistency of the wastewater discharge permits issued by Ecology and to improve the efficiency of the permitting process." AR at 0164.0017, .0031 (boldface omitted). The introduction clarifies that the Manual "is not regulation and should not be cited as regulatory authority for any permit condition." AR at 0164.0033. Rather, the Manual "describes law and regulation pertaining to permitting," which "must be followed to issue a legal permit." *Id.* "Where those laws and regulations are not explicit on implementation the manual describes a process for implementation" that has been developed by Ecology, but "[i]f the process does not fit a permitting circumstance, the permit writer can explore alternative processes as long as the law and regulation are met." *Id.* Permit writers are expected to "exercise a considerable amount of discretional authority" and "good judgment." AR at 0164.0036-.0037.

The Manual describes the test methods for identifying and measuring PCBs as "evolving rapidly." AR at 0164.0242. Ecology added Section 4.5 to the Manual in 2018 to specifically

address methods for identifying and measuring PCBs. The Manual emphasizes that only test methods approved under 40 C.F.R. part 136 can be used for permit applications and permit compliance monitoring, consistent with federal regulation. Because Method 608 (now 608.3) is the only method for analyzing PCBs that is approved under part 136, Section 4.5 repeatedly states that it must be used for permit applications and for monitoring compliance with numeric effluent limits for PCBs. *See, e.g.*, AR at 0164.0249, .0256, .0261-.0263.[2]

The Manual clearly states that Methods 8082A and 1668C cannot be used to evaluate compliance with numeric effluent limits for PCBs. However, the Manual presents Methods 8082A and 1668C, along with Method 608.3, as "the three methods that are used for permitting purposes." AR at 0164.0249. Because water quality standards for PCBs are lower than Method 608.3 can evaluate, and Methods 8082A and 1668C "provide lower analytical limits," Ecology advises that Methods 8082A and 1668C may be used for purposes other than evaluating compliance. AR at 0164.0250.

For example, Section 4.5 specifically advises permit writers to "[u]se all valid and applicable data, including data collected using methods not approved under 40 [C.F.R.] Part 136 (e.g. Methods 1668C and 8082A)," to evaluate whether a discharger's effluent has the reasonable potential to violate a water quality standard and to calculate appropriate numeric effluent limits for permits. AR at 0164.0261-.0262. Section 4.5 also allows permit writers to evaluate the effectiveness of best management practices using "methods appropriate" for this purpose. AR at 0164.0263. This method selection "will depend on expected concentrations in the sampled media,

---

[2] At the time of the Manual's publication, Method 608, an earlier iteration of Method 608.3, was still permitted as laboratories were in the process of receiving accreditation for Method 608.3.

the [practices] required or selected, and the potential sources of PCBs on and to the site or facility." AR at 0164.0264. And it may be appropriate to use Method 1668C where "identification of sources based on congener profile is necessary." AR at 0164.0263.

With Method 1668C specifically, Ecology explains that it is "***not*** proposing to seek EPA approval of this method under 40 [C.F.R.] part 136.5," which provides for approval of alternate methods for limited regional use, "as there are known problems in regards to the repeatability and accuracy of the method in addition to the expense of the analysis." AR at 0164.0256. But Ecology recognizes that "targeted monitoring under Method 1668C" may be "useful for identifying PCB sources" or "evaluating the effectiveness of a best management practice," two activities that are separate from compliance monitoring. AR at 0164.0257.

A quality assurance project plan is required when using Method 1668C for any purpose, and it is recommended when using Method 8082A. These plans "ensure that the collected environmental data can be used for making decisions." *Id.* They detail the processes necessary for "data collection, management[,] and subsequent analysis," and they develop standard operating procedures "to evaluate and control data accuracy." AR at 0164.0258. Procedures such as measuring the PCBs present in distilled water (blanks) for comparison "increase result precision" and "ensure no contamination occurs at any point during the analytical procedure." AR at 0164.0255.

Subsection 4.5.4 provides additional guidance that permit writers "should consider . . . when requiring monitoring using either [M]ethod 8082A or 1668C." AR at 0164.0257. For example, before requiring additional data collection, the permit writer should consider "the question the additional monitoring is going to attempt to answer and what kind of data is needed

to meet that end." *Id.* Some monitoring may be done to assist with making a decision, while other monitoring may serve to estimate the scope of a problem. Additionally, while Method 1668C is the most sensitive method, it is also the most expensive. Therefore, "it is not necessarily appropriate to require this method when [M]ethod 8082A will also return detectible concentrations." AR at 0164.0260. "Information collected through previous monitoring should help the permit writer understand which method to select." *Id.*

Section 4.5.5 further advises permit writers on how to select the appropriate analytical test method and instructs permit writers to "[o]nly include monitoring requirements when necessary for the facility and its specific discharge situation." *Id.* If dischargers are unlikely to have PCBs in their effluent at levels that would violate water quality standards, then "PCB monitoring may not be necessary." *Id.* "While PCB monitoring may be appropriate for some dischargers based on individual facility characteristics, permit writers should consider the value and purpose of requiring PCB monitoring when developing discharge permits." AR at 0164.0261.

Thus, Section 4.5 requires that only Method 608.3 be used to ultimately determine compliance with PCB effluent limits, but the more sensitive test Methods, 8082A and 1668C, can be used for other purposes in the course of the permitting process.

ANALYSIS

PROMULGATING A "RULE" UNDER THE APA

Northwest Pulp & Paper argues that when Ecology added Section 4.5 to the 2018 version of its Permit Writer's Manual, it promulgated a rule that is invalid under RCW 34.05.570(2)(c). Northwest Pulp & Paper argues Section 4.5 is an invalid rule because it was adopted without compliance with statutory rule-making procedures and because Ecology's decision to allow permit

writers to require the use of test methods that are not approved under 40 C.F.R. part 136 exceeds the agency's authority and is arbitrary and capricious. We disagree. Section 4.5 is not a rule, and RCW 34.05.570(2)(c) does not apply.[3]

A.    Defining a "Rule" Under the APA

To be valid, a rule must comply with the requirements of the APA. RCW 34.05.375. We may invalidate a rule if it was adopted without compliance with statutory rule-making procedures, if its promulgation exceeded the agency's authority, or if it is arbitrary and capricious. RCW 34.05.570(2)(c). We review the validity of a rule de novo. *Ctr. for Biological Diversity v. Dep't of Fish & Wildlife*, 14 Wn. App. 2d 945, 967, 474 P.3d 1107 (2020).

As a preliminary matter, however, we must determine whether the challenged agency action in this case falls within the APA's definition of a "rule." To determine whether an agency action constitutes a rule under the APA, we look to the Act's statutory definition. *McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs.*, 142 Wn.2d 316, 322, 12 P.3d 144 (2000). The label the agency assigns to the action is not determinative. *Id.*

Under the APA, there are two elements of a rule. For an agency action to qualify as a rule, it must be an "agency order, directive, or regulation of general applicability," and it must fall into one of five enumerated categories. RCW 34.05.010(16); *see also Failor's Pharmacy v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 494, 886 P.2d 147 (1994). An agency action is not a rule if

---

[3] Northwest Pulp & Paper conceded that if Section 4.5 is not a rule, this rule challenge fails. During oral argument, Northwest Pulp & Paper explained that RCW 34.05.570(4), addressing other agency action, is not a basis it is relying on for this challenge. *See* Wash. Court of Appeals oral argument, *Northwest Pulp & Paper v. Dep't of Ecology*, No. 55164-1-II (Sept. 10, 2021), at 10 min., 55 sec. through 12 min., 42 sec., *audio recording*, TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2021091014.

it consists of "statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public." RCW 34.05.010(16)(i).

1.      Directive of general applicability

An agency action is a directive of general applicability if it is "applied uniformly to all members of a class." *Failor's Pharmacy*, 125 Wn.2d at 495. For example, in *Simpson Tacoma Kraft Co. v. Department of Ecology*, Ecology instituted a numeric limit on the discharge of dioxin and "uniformly applie[d]" that limit to "all entities which discharge dioxin into the state's waters, regardless of which entity or water body is at issue." 119 Wn.2d 640, 648, 835 P.2d 1030 (1992). The Supreme Court concluded that this was a directive of general applicability because Ecology applied the standard "uniformly to the entire class of entities which discharges dioxin into the state's water." *Id.*

How the agency applies the challenged standard, not the outcome of the application, is determinative. The outcomes for individual entities may differ even when a standard is uniformly applied. For example, in *Failor's Pharmacy*, Medicaid prescription service providers challenged amendments to reimbursement payment schedules. 125 Wn.2d at 490. Although the amount that each service provider was reimbursed differed based on factors such as the number of prescriptions they dispensed per year, each amount was determined by the agency applying the same, uniformly applicable, reimbursement schedules. *See id.* at 491-92. Thus, the schedules were directives of general applicability. *Id.* at 495-96.

In contrast, this court has held that an agency action is not a directive of general applicability where the challenged action is a document "written to guide agency staff" that "does not require strict adherence." *Sudar v. Dep't of Fish & Wildlife Comm'n*, 187 Wn. App. 22, 31-32,

347 P.3d 1090 (2015). In *Sudar*, petitioners challenged a policy document that the Department of Fish and Wildlife Commission developed to "guide the Department [of Fish and Wildlife] in its management of state resources," including its "adoption of fishery rules." *Id.* at 25-26. But the policy document itself had "no legally enforceable regulatory effect on fishers." *Id.* at 32. Its objectives were "unenforceable until and unless the Department promulgate[d] rules" implementing them, and a fisher could not be penalized for violating the policy document. *Id.* Department staff were not bound by the policy document either. *Id.* at 33.

In sum, not every agency action carries the force of a rule. Where the agency action provides guidance for agency staff that (1) allows staff to exercise discretion, (2) provides for case-by-case analysis of variables rather than uniform application of a standard, and (3) is not binding on the regulated community, the action does not constitute a directive of general applicability.

    a.  Section 4.5 does not mandate use of Methods 8082A and 1668C, and instead it contemplates permit writer discretion

When Section 4.5 addresses which testing methods should be used for various purposes, it only employs mandatory language to specify when regulations require use of Method 608.3. The section is clear that Method 608.3 must be used in permit applications and to monitor compliance with numeric effluent limits because these requirements are established in federal regulations.

For all other purposes, Section 4.5 allows for flexibility and discretion in determining which testing methods will be required in an individual permit or permitting process. For example, Methods 8082A and 1668C "*may* be used for permitting purposes to evaluate sources [of PCB pollution], but not for numeric effluent limit compliance." AR at 0164.0250 (emphasis added). "For the purposes of applying [all known and reasonable technologies to control pollution], Method 1668C *may be required*," but this depends on the need to identify individual congeners,

whether the expected concentrations of PCBs can be detected or quantified by Method 608.3, and the specific water treatment goals. AR at 0164.0263 (emphasis added). Permits also "*may require monitoring using two different methods for two different purposes (e.g., Method 608.3 for monitoring to assess compliance with a numeric effluent limit and Methods 1668C or 8082A for [best management practices] effectiveness monitoring)*." AR at 0164.0264 (emphasis added). The Manual advises the permit writer to "consider the result [they] want to achieve and the appropriateness of additional sampling." AR at 0164.0260. Permit writers are expected to "exercise a considerable amount of discretional authority" and "good judgment." AR at 0164.0036-.0037. The plain language of Section 4.5 does not mandate use of Methods 8082A or 1668C. Instead, the decision to require use of these methods is within the permit writer's discretion.

b.      Section 4.5 does not contain a uniformly applicable standard

Unlike in *Simpson* and *Failor's Pharmacy*, Section 4.5 does not require permit writers to uniformly impose PCB testing requirements on all entities discharging any amount of PCBs into any body of water. The Manual expressly states that "PCB monitoring may not be necessary" if the PCBs in a discharger's effluent are unlikely to violate water quality standards, and it instructs permit writers to "[o]nly include monitoring requirements when necessary for the facility and its specific discharge situation." AR at 0164.0260.

The decision of whether to require any additional testing for PCBs will depend on multiple site-specific variables. Permit writers should consider the discharging facility's size, the possibility of preexisting pollution in the water, the type of pollutants involved, and what benefit additional monitoring would offer "before requiring PCB characterization in permits." *Id.*

If permit writers do decide to impose additional testing to monitor the presence of PCBs, Section 4.5 instructs them to again consider site-specific variables and to exercise discretion. For example, when evaluating the effectiveness of best management practices, a permit writer's method selection will depend on the expected concentrations of pollutants in the water, the best practices required of the discharger, and the potential sources of PCBs. Section 4.5 advises that "[i]nformation collected through previous monitoring should help the permit writer understand which method to select." *Id.*

The Manual also recognizes that the costs of different testing methods vary substantially, with Method l668C being the most expensive. Therefore, it cautions that while Method 1668C "will return information down to the lowest quantifiable level, it is not necessarily appropriate to require this method when [M]ethod 8082A will also return detectible concentrations." *Id.*

In *Failor's Pharmacy*, outcomes differed for the individual entities being regulated, but the same reimbursement schedules were imposed on all members of the regulated community. Here, individual outcomes differ because permit writers are considering and imposing different obligations within each permit—under the Manual's guidance—after reviewing site-specific conditions. Even though permit writers are instructed to use the guidance in the Manual "'for all PCB monitoring in all water quality permits,'" there is no uniform directive within the Manual that requires permit writers to impose testing Method 1668C or 8082A. Appellants' Opening Br. at 33 (emphasis omitted) (quoting AR at 0449.0003).

The Manual instructs permit writers to "[u]se all valid and applicable data, including data collected using methods not approved under 40 [C.F.R.] Part 136 (e.g. Methods 1668C and 8082A)" to evaluate whether a discharger's effluent has the reasonable potential to violate a water

quality standard and to calculate appropriate numeric effluent limits for permits. AR at 0164.0261-.0262. Northwest Pulp & Paper argues this language "directs and requires permit writers to use unapproved test methods" for these purposes. Appellants' Opening Br. at 25. This language requires only that permit writers use all available data to make the most informed decisions possible. The Manual does not state that permit writers must mandate data collection using Methods 1668C and 8082A where such data does not already exist.

Moreover, a state policy goal is to prevent all discharges that cause or contribute to a violation of water quality standards. RCW 90.48.520; WAC 173-201A-510(1). Requiring permit writers to use all valid and applicable data to evaluate the reasonable potential of a discharge to violate water quality standards is one way to achieve this stated goal. As explained above, Method 608.3 can detect PCBs at a concentration of 0.065 μg/L, but the state numeric criterion for human health is 0.00017 μg/L. If Ecology cannot use data collected using more sensitive test methods, then Ecology cannot know when a permittee is discharging PCBs at a concentration lower than 0.065 μg/L yet higher than the water quality criterion of 0.00017 μg/L. The development of numeric effluent limits for each permit is Ecology's responsibility under the law, and the Supreme Court has affirmed that "Ecology may use any data gathered in the past for its decision making on permits." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 400, 932 P.2d 139 (1997).

Section 4.5 does not uniformly require PCB testing, nor does it require uniform application of a specific standard to determine what testing method should be used in a particular circumstance.

   c.  Section 4.5 has no regulatory effect, instead it is guidance for permit writers

The Manual is intended to *guide* use of the more sensitive testing methods in permitting. Importantly, Section 4.5 has "no legally enforceable regulatory effect" on PCB dischargers, and

dischargers cannot be penalized for violating the Manual. *Sudar*, 187 Wn. App. at 32. Only a violation of a specific NPDES permit condition will subject a discharger to an enforcement action.

Like the policy at issue in *Sudar*, Section 4.5 is "written to guide agency staff," and it "does not require strict adherence" with its guidance. *Id.* at 31-32. Although the Manual's preliminary note requires permit writers to use its listed procedures, the note also contemplates that permit writers may deviate from those procedures. "If a permit writer believes a permitting situation requires a different process than in the manual," then they are instructed to "discuss the alternative process with their supervisor." AR at 0164.0004. This is reiterated in the Manual's introductory section, which explains that the Manual "is not regulation" but it "describes law and regulation pertaining to permitting." AR at 0164.0033. "If the process does not fit a permitting circumstance, the permit writer can explore alternative processes as long as the law and regulation are met." *Id.*

In sum, Section 4.5 is not a directive of general applicability. Its purpose is to guide agency staff in their exercise of discretion as they implement the NPDES permit program and develop site-specific discharge permits. It is not binding on either the regulated community or agency staff.

        2.        <u>Enumerated categories</u>

Because Northwest Pulp & Paper fails to show that Section 4.5 satisfies the first element of the APA's definition of a "rule," we decline to consider whether Section 4.5 falls into one of RCW 34.05.010(16)'s enumerated categories and satisfies the second element.

We hold Ecology did not adopt a rule when it added Section 4.5 to the Manual.

B.      <u>Northwest Pulp & Paper Has Not Established Invalidity Under the APA</u>

Northwest Pulp & Paper argues Section 4.5 is an invalid rule under RCW 34.05.570(2)(c) because the section was added without compliance with statutory rule-making procedures, its

promulgation exceeded Ecology's authority, and it is arbitrary and capricious. Because we hold that Section 4.5 is not a rule, RCW 34.05.570(2)(c) is inapplicable, and we do not consider these arguments.

Although Section 4.5 is not subject to judicial review as a rule, we note that procedural avenues are available for dischargers to challenge an Ecology decision to impose specific requirements to test for PCBs using Method 1668C or 8082A. Dischargers may challenge the issuance, modification, or termination of their permit, including any modification of its conditions or terms, before the Pollution Control Hearings Board. RCW 43.21B.110(1)(c). Dischargers may also challenge the enforcement of any permit condition. RCW 34.05.570(3); RCW 43.21B.110(a)-(b). Additionally, requirements to use more sensitive testing methods outside of the permit's conditions, such as during the permit application process, may constitute other agency action that can be challenged under RCW 34.05.570(4).

No. 55164-1-II

CONCLUSION

We hold Ecology did not promulgate a rule under the APA when it added Section 4.5 to its Permit Writer's Manual. Accordingly, we affirm the superior court's order dismissing Northwest Pulp & Paper's petition for judicial review and denying its request for declaratory judgment.

Glasgow, A.C.J.

We concur:

Cruser, J.

Veljacic, J.