# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | No. 52781-2-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY and BP WEST COAST PRODUCTS, LLC, | |
| Respondents. | |

MAXA, J. – The National Parks Conservation Association (NPCA) appeals the final order of the Pollution Control Hearings Board (PCHB) affirming the issuance of a Prevention of Significant Deterioration (PSD) permit by the Department of Ecology (Ecology) to BP West Coast Products, LLC (BP).

BP owns and operates the Cherry Point refinery in Blaine, which is located near both Olympic National Park and North Cascades National Park. BP planned to install two new, more efficient coker heaters at the refinery. Because both national parks are designated as class I areas under the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q, BP needed to obtain a PSD permit from Ecology for the installation.

BP submitted a PSD permit application to Ecology and later provided supplemental materials, which included calculations showing that the coker heater installation would not have adverse visibility impacts to the two national parks. The Federal Land Managers (FLMs), which included the National Park Service (Park Service), reviewed the application. Using the Federal

Land Managers' Air Quality Related Values Work Group (FLAG) guidance document, the Park Service asserted that its calculations showed that the coker heater installation would result in adverse visibility impacts to the national parks.

As the permitting agency, Ecology agreed with BP's analysis and disagreed with the Park Service's analysis. After notice and comment, Ecology issued the permit to BP without including mitigation for the adverse impacts the Park Service identified. The permit attachments included Ecology's explanation for disregarding the Park Service's position and detailed responses from both Ecology and BP to the Park Service's analysis.

The Park Service did not challenge the issuance of the PSD permit. But the NPCA filed an appeal with the PCHB, arguing that Ecology did not follow the FLAG guidance and erred in issuing the permit. After a hearing, the PCHB affirmed the issuance of the permit.

We hold that (1) the PCHB did not err in affirming Ecology's issuance of the permit to BP despite the Park Service's contrary application of FLAG, and (2) the PCHB's presiding board member did not abuse his discretion in admitting and excluding evidence. Accordingly, we affirm the PCHB's order affirming Ecology's issuance of the PSD permit to BP.

FACTS

*Regulatory Background*

Congress has declared that the remedying and prevention of any impairment of visibility resulting from manmade air pollution in class I areas is a "national goal." 42 U.S.C. § 7491(a)(1). National parks are designated as class I, and require the greatest level of air quality protection. 42 U.S.C. §§ 7475(d), 7472(a).

Under the CAA and the Environmental Protection Agency's (EPA) regulations, any modification to a major stationary source of air pollution located in an area with air quality that

meets the national ambient air quality standards must obtain a PSD permit. 42 U.S.C. §§ 7475(a)(1), 7479; 40 C.F.R. § 52.21(a)(2). Facilities seeking to obtain a PSD permit must comply with emissions limitations that reflect the best available control technology (BACT) for each pollutant that is subject to regulation under the CAA. 42 U.S.C. § 7475(a)(4). In Washington, Ecology administers the PSD permitting program pursuant to authorization from the EPA. 80 Fed. Reg. 23,721 (Apr. 29, 2015). Ecology's regulations incorporate federal requirements for PSD permitting from 40 C.F.R. § 52.21. WAC 173-400-025 and WAC 173-400-720(4)(vi).

Although the CAA does not give FLMs authority to issue or reject permit applications, it does charge them with "an affirmative responsibility to protect the air quality" in the protected areas, and requires them to "consider . . . whether a proposed major emitting facility will have an adverse impact." 42 U.S.C. § 7475(d)(2)(B). The FLMs, in consultation with the state and/or EPA, analyzes whether a proposed major project will have an adverse impact on air quality related values (AQRVs). 42 U.S.C. § 7475(d)(2)(B).

To assist in this process, the Park Service along with other FLMs developed a guidance document called FLAG to help assess adverse effects on class I areas. Within FLAG, the FLMs created a tool to screen out projects that would not have a significant impact on AQRVs based on annual emissions and distance from a class I area. The method is called the Q/D method, and it divides the amount of emission increase (Q) in tons per year by the distance to a class I area (D). FLAG provides that if the Q/D value is less than 10, the source will have a negligible impact on a class I area and will not require any further impact analyses.

If the Q/D is greater than 10, FLAG provides that a full AQRV must be conducted to determine if the project would have adverse impacts on visibility. FLAG establishes a threshold

of concern of a five percent in change in light extinction on the 98th percentile day, based on a three-year average.

Ecology's PSD guidance manual requires that it follow the FLAG guidance when assessing impacts. And Ecology must consider the adverse impact analysis submitted by the FLM in its permitting decision. WAC 173-400-117(5)(a). However, even if the FLMs determine that a project will have an adverse impact, the CAA, federal regulations, and Washington regulations indicate that Ecology must deny a PSD permit only if Ecology is satisfied that the FLMs are correct. 42 U.S.C. § 7475(d)(2)(C)(ii); 40 C.F.R § 52.21(p)(3); WAC 173-400-117(5)(c).

Washington also has adopted a regional haze plan for the state. This plan was adopted pursuant to the EPA's Regional Haze Rule, which requires states to identify and implement pollution control strategies and make progress toward returning visibility to natural conditions by 2064.

*PSD Permit Application*

BP owns and operates the Cherry Point refinery, which is located in Blaine and is 101 kilometers from Olympic National Park and 80 kilometers from North Cascades National Park. Both national parks are designated as class I areas. WAC 173-400-118.

In 2014, BP proposed replacing two of the existing coker heaters at the refinery with new, more efficient ones. Because the new coker heaters would increase the emissions of various pollutants, a PSD permit was required. BP filed an application for a PSD permit with Ecology and provided a copy to the Park Service. BP submitted a revised application in March 2016.

In October 2016, the Park Service provided preliminary comments regarding BP's application. Based on some of the comments, Ecology asked BP to provide additional clarification regarding its AQRV analysis.

BP provided a supplement to the application in November 2016. BP included a Q/D analysis showing that the highest ratio was five, far below the ratio of 10 that would require further AQRV analysis. Nevertheless, BP completed the rest of the AQRV analysis, which showed that the increase in visibility impacts would be 2.64 percent for Olympic National Park and 1.34 percent for North Cascades National Park. These impacts were below the five percent FLAG threshold for light extinction at both national parks.

On November 14, 2016, Ecology released a draft PSD permit for BP's coker heater project. In December, the Park Service issued an adverse impact determination regarding visibility based on its calculation that the expansion would increase the number of poor visibility days from 54 to 70 at Olympic National Park and from 38 to 54 at North Cascades National Park. The Park Service also issued technical comments on BP's application.

The EPA Region 10 also commented on the project, identifying certain issues and the ways that BP could fix those problems to qualify for the PSD permit. Specifically, the EPA highlighted that Ecology used the wrong emissions increase calculation in its analysis of AQRVs and should have used the calculation in FLAG. But the EPA did not object to the permit.

Ecology concluded that BP had satisfied applicable PSD regulations and had adequately addressed AQRVs (including visibility) in accordance with the FLAG manual. Ecology noted that BP had shown that the Q/D for the project was less than 10 and that the changes in light extinction were less than the five percent threshold established by FLAG. Ecology also identified several areas in which the Park Service's analyses were inconsistent with FLAG.

Ultimately, Ecology determined that the project would not result in any significant impacts in class I areas. On May 23, 2017 Ecology issued the PSD permit to BP without including mitigation for the adverse impacts that the Park Service identified. In the attached technical support document (TSD), Ecology explained its decision and the reasons for not agreeing with the Park Service's analysis. The TSD also attached as appendices detailed responses from both Ecology and BP to issues raised in the Park Service's adverse impact determination and technical comments.

*PCHB Hearing*

The Park Service did not appeal the PSD permit. However, the NPCA filed an appeal with the PCHB. The NPCA argued that Ecology's issuance of the PSD permit was improper because it was contrary to the Park Service's determination that the coker heater project would adversely affect air quality.

The PCHB held a five-day hearing in April 2018. The PCHB considered written testimony, heard testimony from a number of witnesses, and reviewed extensive written materials relating to the PSD permit.

Howard Gebhart provided written expert testimony for the NPCA. Regarding Q/D, Gebhart stated that the Q/D calculation could not exempt BP from the AQRV analysis because emissions from BP's refinery already were causing visibility impairments at both national parks. He also claimed that BP underestimated the projected emissions from the project, and using proper emissions numbers would have resulted in a Q/D of over 10. Specifically, he noted that BP considered only the increased emissions from the coker heaters themselves and not from increases at other emission points, which he called "affected sources," that would result because the new coker heaters did not have to be shut down to be cleaned.

Regarding the AQRV analysis, Gebhart stated that he believed that BP originally used a calculation that FLAG cautioned against using. However, he later acknowledged that BP used the correct formula in its November 2016 submission. Nevertheless, Gebhart emphasized again that BP failed to account for increased emissions from affected sources elsewhere in the refinery that resulted from the increased capacity of the new coker heaters.

Gebhart's ultimate conclusion was that BP's analysis was performed incorrectly and was inconsistent with FLAG, and that the Park Service's analysis was correct and generally conformed with FLAG.

Eric Hansen, an air quality consultant, provided written expert testimony for Ecology and BP. He disagreed with Gebhart that the Q/D analysis was not appropriate because BP's refinery already impacted visibility. Hansen emphasized that FLAG established Q/D as the threshold analysis, and FLAG did not suggest that this analysis could not be applied for a project at a facility that already affected visibility. He concluded that BP's Q/D analysis standing alone provided a basis for affirming Ecology's issuance of the PSD permit.

Regarding the AQRV analysis, Hansen stated that he disagreed with Gebhart's position that emissions from affected sources other than the coker heaters themselves had to be included in projected emissions. He noted that because of limitations of other equipment, the new coker heaters would not increase hourly or daily production. But because the new coker heaters did not need to be shut down for cleaning, the refinery could operate for more hours over the course of a year. Hansen stated that annual emissions were not relevant because the AQRV visibility analysis is based on 24-hour emissions. Therefore, Hansen concluded that Gebhart was mistaken and that the emissions from affected sources did not need to be included in the analysis.

Hansen's ultimate conclusion was that BP's AQRV analysis was performed correctly and was consistent with FLAG. Conversely, he believed that the Park Service's analysis was flawed in a number of ways. In live testimony, Hansen noted that BP's AQRV analysis determined that the coker heater project would have no significant adverse impacts to visibility. He believed that BP and Ecology properly evaluated the AQRV impacts for the project. And he thought that Gebhart's claims that the AQRV analysis was improper had no merit.

Alan Newman, a senior quality engineer with Ecology, also testified. He stated that it was inappropriate to use annual emissions in the AQRV analysis. He also emphasized that the correct calculation focused only on daily emissions from the new coker heaters and not emissions from the entire facility.

Gary Huitsing, a permit and policy engineer for Ecology, testified about a May 8, 2017 conference call he participated in with Marc Crooks, the lead of Ecology's PSD program, and Park Service staff. Regarding the call, Huitsing stated that he and Crooks suggested that the Park Service's concerns should be addressed through the regional haze program. Huitsing also testified that Ecology offered to meet with the Park Service again a few days later, but the Park Service declined and stated that they would write a white paper regarding their concerns about air quality.

Huitsing later received a letter from the Park Service that he understood to be "an acknowledgment that their concerns for the facility as a whole should be addressed through a regional progress phase or, as they word it, of the regional haze rule." Administrative Record (RP) at 870.[1] Huitsing testified that he believed that the Park Service had not changed its

---

[1] Much of the administrative record is cited as clerk's papers (CP), but the PCHB's hearing transcripts are cited as report of proceedings (RP).

opinion regarding its adverse impact determination, but had changed its opinion regarding how to approach the issue. Huitsing stated that "they tried to use the PSD program to attain their goals, and we pointed out to them that that's not the proper route, to use the PSD rules, as applied to the new source review." RP at 871-72. Huitsing's understanding was that the Park Service now agreed. Huitsing also testified that Ecology would not have issued the PSD permit if the Park Service had continued to object.

During Hansen's cross examination, the NPCA attempted to introduce a 2010 email that a senior environmental engineer at the refinery sent to Hansen telling him that a certain emissions test was not what BP reported but to "[k]eep this under your hat for now." CP at 1770. BP objected because the email was written long before the preparation of the coker heater application.

The NPCA argued that the email was relevant because it revealed some connection between regional haze and PSD permitting and it went to Hansen's credibility. The presiding board member sustained the objection because he did not "see the relevance here, I don't see the connection to regional haze, and I mentioned earlier that I was not inclined to admit these earlier exhibits for the purpose of attacking BP's credibility." RP at 721.

*PCHB Decision*

After the hearing, the PCHB issued detailed findings of fact and conclusions of law. The PCHB summarized the testimony of both Gebhart and Hansen in its findings of fact.

The PCHB stated in its conclusions of law that the FLMs have no permitting authority under the CAA and that FLAG is not a federal rule or standard, but only assists the FLMs when carrying out their consultative role. If the FLMs demonstrate to the satisfaction of the State that emissions will have an adverse impact on AQRVs, the State will not issue a PSD permit. But

9

while the permitting agency must take into consideration the recommendation of the FLMs, the

final decision rests with the permitting agency.

The PCHB stated that under applicable law,

The permitting agency is authorized to reject the [FLMs'] findings after concluding on reasonable grounds that the findings could not be substantiated. A permitting agency's discretion is not unfettered, but as long as it is not exercised in an arbitrary or capricious manner, the agency's discretion takes precedence under the [CAA].

CP at 1691 (citations omitted).

The PCHB stated its ultimate ruling regarding air quality in two conclusions of law:

[13] In this case, Ecology considered the [FLMs'] comments on adverse impacts to Class I areas and worked with the [FLMs] to address their concerns. At some point, the [FLMs] offered no further objections, although they did not withdraw their determination of adverse impacts. The [FLMs] did not file any formal appeal of the permit and their current position on this issue is unclear. The permit writer for Ecology testified he would not have issued PSD 16-01 in the face of continued objections by the [FLMs]. Ultimately, Ecology determined that the project would not result in any significant impacts to AQRV in Class I areas and issued PSD 16-01. As required by state regulations, Ecology explained its rationale in the permit's public review process. As the permitting agency. Ecology had the legal authority to issue PSD 16-01, despite the [FLMs'] objections.

[14] . . . [T]he Board concludes that Ecology has complied with all applicable state and federal laws and its actions were not unreasonable, or arbitrary or capricious. Ecology did not erroneously issue PSD 16-01 to BP as *the evidence established that the project will not have an adverse impact on AQRV at Class l areas, here Olympic National Park and North Cascades National Park.*

CP at 1692 (emphasis added) (citations omitted).[2]

The NPCA seeks judicial review of the PCHB's final order. A commissioner of this

court entered an order accepting direct review under RCW 34.05.518.

---

[2] The PCHB also addressed three other issues not challenged here. It concluded that Ecology did not err in issuing the PSD permit (1) without requiring the use of SCR emission control technology as BACT for nitrous oxides, (2) without requiring the use of a lean oil absorption system with a compressor for sulfur oxides, (3) that a change in fuel gas was not a change of operation that would require BACT for all affected units.

ANALYSIS

A.   STANDARD OF REVIEW

The Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of agency decisions, including PCHB's orders. RCW 34.05.510; *Puget Soundkeeper Alliance v. Dep't of Ecology*, 191 Wn.2d 631, 637, 424 P.3d 1173 (2018). Our review is limited to the record before the PCHB. *Puget Soundkeeper*, 191 Wn.2d at 637.

Under the APA, we may grant relief from an agency's order based on one of nine reasons listed in RCW 34.05.570(3), including that the order is (1) based on an erroneous interpretation or application of the law, (2) not supported by substantial evidence, or (3) arbitrary and capricious. RCW 34.05.570(3)(d), (e), (i). The party challenging the agency's decision has the burden of demonstrating the invalidity of that decision. RCW 34.05.570(1)(a).

We review de novo questions of law, statutory construction, and an agency's application of the law. *Puget Soundkeeper*, 191 Wn.2d at 637.

We review an agency's factual findings for substantial evidence, "asking whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true." *Pac. Coast Shredding, LLC v. Port of Vancouver, USA*, 14 Wn. App. 2d 484, 501, 471 P.3d 934 (2020). Courts "defer to the agency's broad discretion in weighing the evidence." *Whidbey Envtl Action Network v. Growth Mgmt. Hr'gs Bd.*, 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020). An agency's unchallenged findings of fact are verities of appeal. *Darkenwald v. Emp't Sec. Dep't*, 183 Wn.2d 237, 244, 350 P.3d 647 (2015).

B.   ECOLOGY'S ISSUANCE OF PSD PERMIT

The NPCA argues that the PCHB erred in affirming Ecology's issuance of the PSD permit to BP without including mitigation for the adverse impacts the Park Service identified.

11

Specifically, the NPCA asserts that the PCHB should have deferred to the Park Service's interpretation of the FLAG guidance document instead of deferring to Ecology's interpretation. We disagree.

      1.   Legal Principles

As noted above, Ecology administers the PSD permitting program in Washington through EPA authorization. 80 Fed. Reg. 23,721 (Apr. 29, 2015). The CAA dictates that a permit shall not be issued where "the [FLM] demonstrates *to the satisfaction of the State* that the emissions from such facility will have an adverse impact on the air quality-related values (including visibility) of such lands." 42 U.S.C. § 7475(d)(2)(C)(ii) (emphasis added). If the FLM demonstrates that the emissions from a proposed project would have an adverse effect on AQRVs and the State permitting administrator concurs, the State shall not issue the permit. 40 C.F.R § 52.21(p)(4).

However, 40 C.F.R. § 52.21(p)(3) states, "Where the Administrator finds that [the FLM's] analysis does not demonstrate to the satisfaction of the Administrator that an adverse impact on visibility will result in the Federal Class I area, the Administrator must, in the notice of public hearing, either explain [its] decision or give notice as to where the explanation can be obtained."

Washington's regulations are similar. If the permitting authority agrees with the FLMs' demonstration that net emissions increase from a proposed major modification would have an adverse impact on visibility, the PSD permit shall be denied. WAC 173-400-117(5)(b). But if the permitting authority does not agree with the FLMs' adverse impact determination, the "permitting authority shall state in the public notice . . . that an explanation of the decision appears in the Technical Support Document for the proposed permit." WAC 173-400-117(5)(c).

"While the permit issuer must give reasonable consideration to a Federal Land Manager's assertion of an adverse impact, the final decision rests with the permitting authority." *In the Matter of Old Dominion Elec. Coop.*, 3 E.A.D. 779, 783 (1992). This does not mean the permitting authority's discretion is unlimited. *Id.* at 783 n.9. But as long as the rejection is not arbitrary or capricious, it takes precedence under the CAA. *Id.* In addition, "[i]f the state authority chooses to disregard an adverse impact determination, it must – in accordance with federal requirements for state implementation plans – explain its decision in writing and publish the explanation." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 3 (D.C. Cir. 2005).

FLAG itself recognizes the limited role of the FLMs:

> Although the FLMs have an "affirmative responsibility" to protect AQRV's, they have no permitting authority under the CAA, and they have no authority under the CAA to establish air quality-related rules or standards. . . . It is important to emphasize that the FLAG report only explains factors and information the FLMs expect to use when carrying out their consultative role. It is not a rule or a standard.

CP at 3181.

2. Legal and Factual Support for PCHB Decision

Based on the legal principles stated above, the PCHB correctly concluded that Ecology had the authority to disagree with the Park Service's adverse impact determination. The law allows Ecology to grant a PSD permit if Ecology is not satisfied that the Park Service was correct as long as Ecology provides an explanation for its position. *See* 42 U.S.C. § 7475(d)(2)(C)(ii); 40 C.F.R § 52.21(p)(3); WAC 173-400-117(5)(c).

The NPCA does not dispute that Ecology had the discretion to disagree with the Park Service. And the NPCA does not argue that Ecology failed to provide its reasons for disregarding the adverse impact determination.

In addition, the PCHB made a factual determination that "the evidence established that the project will not have an adverse impact on AQRV at class I areas, here Olympic National Park and North Cascades National Park." CP at 1692 (cl 14).[3] There is no question that substantial evidence supports this finding.

BP's revised submission showed that the Q/D calculation was less than 10, which means under FLAG that there is no adverse impact and that no further analysis is necessary. In addition, BP's AQRV analysis showed that the increase in light extinction for both national parks was under the 5 percent threshold established in FLAG. And Ecology's TSD and Ecology and BP's responses to the Park Service's adverse impact determination explained why they believed that the Park Service's analysis was incorrect. Finally, BP/Ecology's expert Hansen provided his opinion that BP's analysis was correct and supported issuing the PSD permit.

The NPCA provided contrary evidence. The PCHB considered the Park Service's adverse impact determination and other materials that indicated that the project adversely affected visibility. And Gebhart opined that BP's analysis was incorrect and the Park Service's analysis was correct. But the PCHB expressly discussed the testimony of both Gebhart and Hansen and considered all the other evidence, weighed that evidence, and determined that the coker heater project would not have an adverse impact on the two national parks.

3. Deference to the Park Service's Interpretation

The NPCA asserts that the difference in opinion between the Park Service and BP/Ecology was based on differing *interpretations* of FLAG. The NPCA argues the PCHB

---

[3] Although this statement was contained in a conclusion of law, it clearly is a factual finding. This court treats factual findings in conclusions of law as findings of fact. Even if the trial court mischaracterizes findings of fact as conclusions of law, we still analyze them as findings of fact. *Real Carriage Door Co. v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955, *review denied,* 198 Wn.2d 1025 (2021).

erred in its decision because the Park Service's *interpretation* of FLAG must receive deference over Ecology's interpretation because the FLMs drafted FLAG. We disagree.

### a. Differing Interpretations

Initially, it is unclear what the NPCA contends are differing "interpretations" of FLAG rather than mere differences in performing the required analysis.

The primary area of disagreement appears to be that the Park Service included emissions from the entire refinery in addition to the new coker heaters in the analysis, and considered total emissions on an annual basis. BP and Ecology insisted that only emissions from the coker heaters mattered, and the relevant unit of concern was the increase in emissions over a 24-hour period.

The NPCA also claims that BP used the wrong formula in its AQRV analysis. However, as noted above, Gebhart testified that BP corrected that error in its November 2016 submission.

### b. Analysis

We reject the NPCA's argument that the PCHB was required to defer to the Park Service's interpretation of FLAG for several reasons. First, the NPCA's argument goes beyond "deference." In general, even if a court gives deference to an agency's interpretation, the court retains ultimate authority to disagree with that interpretation. *Wash. Cedar & Supply Co., v. Dep't of Labor Indus.*, 137 Wn. App. 592, 598 154 P.3d 287 (2007). The NPCA claims that the PCHB must adopt the Park Service's interpretation of FLAG despite contrary evidence that the Park Service's interpretation is incorrect and apparently even if the Park Service's interpretation is incorrect. In other words, the NPCA essentially is arguing that the FLMs' interpretation of FLAG is binding on the PCHB as a matter of law. The NPCA cites no authority for such a broad proposition.

Second, the NPCA's position is inconsistent with the CAA and related regulations, all of which indicate that Ecology as the permitting authority can disregard the Park Service's objections as long as it provides a rational explanation for its position. *See* 42 U.S.C. § 7475(d)(2)(C)(ii); 40 C.F.R § 52.21(p)(3); WAC 173-400-117(5)(c). The NPCA claims that Ecology must follow the FLMs' position even if Ecology disagrees with the FLMs' interpretation of FLAG. But almost every disagreement regarding the FLAG analysis could be characterized as a difference in interpretation. Therefore, under the NPCA's position, Ecology could almost never disagree with the FLMs' adverse impact determination.

Third, the NPCA's position is inconsistent with FLAG itself. As FLAG emphasizes, it is a guidance document, not a rule or a standard. Nothing in FLAG suggests that how an FLM interprets FLAG provisions is binding on Ecology and the PCHB as a matter of law when evaluating a PSD permit.

Fourth, the NPCA cites no cases that specifically address whether the PCHB must defer to the FLMs' interpretation of FLAG. The NPCA argues by analogy from cases involving other regulations. But the issue here is different because FLAG is merely a guidance document and does not constitute a rule or a standard. Therefore, these cases are inapplicable. And guidance documents are typically not the product of a formal process (e.g., rulemaking or adjudication) that triggers deference. *See Sierra Club v. U.S. Envtl. Prot. Agency*, 671 F.3d 955, 962-63 (9th Cir. 2012). The two cases the NPCA cites that it claims involved guidance documents are distinguishable.

Fifth, the NPCA argues that courts give deference to federal agencies acting within its area of expertise. But Ecology also has expertise in this area. When two agencies disagree regarding an interpretation, weight is given to the agency's interpretation that administers the

16

law. *See Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004). The EPA expressly designated Ecology to be the agency that determines whether to issue PSD permits. We hold that the PCHB did not err in declining to defer to the Park Service's interpretation of FLAG in deciding this case.

4.    Arbitrary and Capricious Decision

The NPCA argues that the PCHB acted arbitrarily and capriciously in upholding Ecology's issuance of the PSD permit because it relied on Huitsing's hearsay testimony about the Park Service's position regarding the PSD permit and ignored the other evidence. We disagree.

An action is arbitrary and capricious if it is willful and unreasoning and taken without consideration of the attending facts or circumstances. *Squaxin Island Tribe v. Dep't of Ecology*, 177 Wn. App. 734, 742, 312 P.3d 766 (2013). As discussed above, extensive evidence supports the PCHB's factual finding that BP's coker heater project would not have an adverse impact on the two national parks. There is no indication that the PCHB relied exclusively on Huitsing's testimony, which in any event was admissible (as discussed below). The NPCA essentially is asking us to reweigh the evidence.

We hold that the PCHB's final order was not arbitrary or capricious.

C.    PCHB'S EVIDENTIARY RULINGS

The NPCA argues that the PCHB's presiding board member erred by admitting portions of Huitsing's testimony that the NPCA characterizes as hearsay, and by excluding the 2010 email a senior environmental engineer at the refinery sent to Hansen, BP's expert. We disagree.

1.    Legal Principles

The APA contains a provision for the admission of evidence at administrative hearings:

> Evidence, including hearsay evidence, is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs. . . . The presiding officer may exclude evidence that is irrelevant, immaterial, or unduly repetitious.

RCW 34.05.452(1).

PCHB regulations contain similar rules. WAC 371-08-300(2) states, "Except where in conflict with the [PCHB's] rules, Washington statutes regarding . . . rules of evidence shall be followed in proceedings before the [PCHB] unless the presiding officer determines that the evidence, although in conflict with the rules of evidence, is admissible pursuant to WAC 371-08-500." Under WAC 371-08-500(1), "[e]vidence, including hearsay evidence, is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs."

We review the PCHB's evidentiary rulings for abuse of discretion. *Port of Seattle*, 151 Wn.2d at 642. "The law gives considerable discretion to administrative law judges to determine the scope of admissible evidence." *Univ. of Wash. Med. Ctr. v. Dept. of Health*, 164 Wn.2d 95, 104, 187 P.3d 243(2008). Discretion is abused if the decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Bayley Constr. v. Dep't of Labor & Indus.*, 10 Wn. App. 2d 768, 795-96, 450 P.3d 647 (2019).

2.  Admitting Huitsing's Testimony

The NPCA does not explicitly identify the exact testimony that it contends was hearsay, instead citing generally to six pages of Huitsing's testimony. However, the NPCA focuses on Huitsing's testimony about statements he heard Park Service staff make during their May 8, 2017 conference call.

Huitsing testified as follows about statements made by Park Service staff during the conference call:

> [W]e remembered language similar to the Tesoro comment where there was a reference to addressing issues to the regional haze program. And we offered to meet again on that Wednesday, May 10th of 2016, and they said that a second meeting was not necessary.

RP at 866.

> [W]e offered to organize a future conference call later that week, as I mentioned, and the National Park Service staff declined the second call but responded that they would write a white paper on their issues and concerns regarding air quality at Class I areas.

RP at 868.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). These statements arguably constituted hearsay because they were out of court statements offered to prove that Park Service staff suggested that their issues should be addressed through the regional haze program and did not believe a second meeting was necessary. However, the presiding board member reasonably could have concluded that these statements were admissible as "the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1); WAC 371-08-500(1). Huitsing was Ecology's PSD permit engineer, and he would need to relay communications between Ecology and Park Service when discussing the status of a permit.

Huitsing also testified about a letter he received from the Park Service, which he stated "seemed to be an acknowledgment that their concerns for the facility as a whole should be addressed through a regional progress phase or, as they word it, of the regional haze rule." RP at 870. This testimony arguably was hearsay to the extent it recited the contents of the letter, but the NPCA expressly stated that it did not object to admission of the letter.

Finally, Huitsing testified that he believed that the Park Service had changed its position and that Park Service now agreed that objecting to the PSD permit was not the proper route to

achieve its goals. But this testimony was not hearsay – it represented Huitsing's own belief rather than out-of-court statements.

The NPCA argues that Huitsing's testimony that he believed that the Park Service had changed its position regarding the PSD permit lacked foundation because it was based on hearsay. Similarly, the NPCA argues that the PCHB improperly relied on hearsay evidence in concluding that the Park Service's position regarding the PSD permit was unclear. However, as stated above, these arguments fail because the presiding board member did not err in admitting this evidence.

We hold that the PCHB's presiding board member did not abuse his discretion in admitting the challenged portions of Huitsing's testimony.

3. Excluding the 2010 Email

The presiding board member excluded the 2010 email because it was irrelevant. Under ER 401, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is not admissible. ER 402. Because the PCHB is guided by the rules of evidence, it can exclude irrelevant evidence. *Port of Seattle*, 151 Wn.2d at 642.

The NPCA argues that the email was relevant because it showed that BP asked Hansen to keep quiet about the fact that some emissions differed from what BP reported to Ecology. The NPCA argues that the email was relevant to the credibility of BP's witness. The email at issue was written to Hansen, who was testifying when the NPCA offered the exhibit. But the author of the email did not testify. And the email was sent before BP even started the process for the PSD

application and clearly involved a matter collateral to the issues in the hearing. Finally, the email was brief and somewhat obscure.

The standard of review for evidentiary rulings is abuse of discretion. *Port of Seattle*, 151 Wn.2d at 642. We hold that the PCHB's presiding board member did not abuse his discretion in excluding the email.

## CONCLUSION

We affirm the PCHB's order affirming Ecology's issuance of the PSD permit to BP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

GLASGOW, C.J.

PRICE, J.